| | |
|---|---|
| MICHAEL NIXON | CIVIL ACTION |
| VERSUS | NUMBER: 16-0821 |
| JERRY LARPENTER, ET AL. | SECTION: "F"(5) |

### ORDER AND REASONS

Before the Court is the motion for summary judgment of Defendants, the Terrebonne Parish Consolidated Government ("TPCG"), Richard Neal ("Neal"), Terrebonne Parish Sheriff Jerry J. Larpenter ("Larpenter"), and Claude Triche ("Triche"), former Warden of the Terrebonne Parish Criminal Justice Complex ("TPCJC"). (Rec. docs. 61. 76). Also before the Court are Plaintiff's memorandum in opposition to the motion as well as Defendants' reply. (Rec. docs. 82, 85). Despite scheduling oral argument on Defendants' motion for May 1, 2019 at 11:00 a.m. (rec. doc. 66) and subsequently continuing the hearing until June 5, 2019 at 11:00 a.m. (rec. doc. 77), no one on Plaintiff's behalf appeared on the latter date and time to argue the matter, so the matter is being decided on the briefs. (Rec. doc. 86). For the reasons that follow, it is ordered that Defendants' motion is granted and that Plaintiff's suit is dismissed.

The above-captioned matter had its genesis on January 29, 2016 when Plaintiff, Michael Nixon, through counsel, filed a complaint against Larpenter, Triche, Neal, Dr. Richard Haydel, the Medical Director at TPCJC, the TPCG, and other unnamed individuals and insurance companies, asserting claims under 42 US.C. §1983 and "like claims" arising under state law. (Rec. doc. 1). Plaintiff alleged that "... on or about [the] end of January or beginning of February [of] 2015," after being arrested and incarcerated at TPCJC since December of 2014, he began experiencing symptoms of what would later be diagnosed as Fournier's

gangrene and necrotizing fasciitis of the perineum and right buttock. (*Id.*). Plaintiff stated that he requested medical care "repeatedly" from three "John Doe" Defendants, to no avail, and that when he finally received "medical treatment" from a fourth "John Doe," a member of the medical staff at TPCJC, it came only in the form of "small portions of inadequate topical ointment and band aids" without an actual physical examination of the site of the infection. (*Id.*). As a result, Plaintiff alleged that his condition worsened to point that he was forced to drain pus from the infection site himself. (*Id.*). Once released from custody, Plaintiff indicated that he sought treatment from and was ultimately admitted to the Terrebonne General Medical Center ("TGMC") where he underwent several surgical procedures including a colostomy. (*Id.*). For the alleged failure of the TPCJC staff to acknowledge and properly treat his medical condition, Plaintiff alleged that the four named Defendants were liable to him under both federal and state law under a theory of *respondeat superior*. (*Id.*).

In response to Plaintiff's original complaint, Defendants Haydel and Neal filed a combined motion under Rules 12(b)(6)/56/12(e), arguing that Plaintiff had failed to exhaust prison administrative remedies prior to filing suit, that his allegations were insufficient to establish liability under *Estelle v. Gamble*[1] and *Monell v. Dept. of Soc. Serv.*,[2] and, as to Haydel, that Plaintiff's claims were premature in that a Medical Review Panel had not been convened under the Louisiana Medical Malpractice Act ("LMMA"). (Rec. doc. 16). That motion was opposed by Plaintiff and subsequently supported by Defendants via a reply memo. (Rec. docs. 21, 24). Following a formal hearing on July 13, 2016, Defendants' motion was denied in part and granted in part and Plaintiff was ordered to amend his complaint. (Rec. doc. 25).

---

[1] 429 U.S. 97, 97 S.Ct. 285 (1976).
[2] 436 U.S. 658, 98 S.Ct. 2018 (1978).

Pursuant to the Court's directive, Plaintiff filed an amended complaint in this matter on July 29, 2016. (Rec. doc. 29).[3/] In that pleading, which named the same Defendants as the original complaint, Plaintiff presented essentially the same factual allegations as were set forth in his initial pleading, following which he alleged that Larpenter and Triche acted with deliberate indifference to his medical needs despite knowing or being in a position to have known about the risk of serious bodily harm to him; that, by virtue of the supervisory positions that they held, Larpenter, Triche, Neal, and Haydel, were responsible for the hiring, training, and supervision of those employees who were tasked with providing care to him; and that those four "[p]olicymaking Defendants" knew that the policies, practices, and procedures with respect to the provision of medical care at TPCJC were inadequate but took no corrective measures. (*Id.*). For these alleged instances of neglect, Plaintiff asserted causes of action under §1983 as well as state law pursuant to the doctrine of *respondeat superior*. (*Id.*).

Plaintiff's amended complaint prompted the filing of a second Rule 12(b)(6) motion by Defendants, Haydel and Neal, which was formally opposed by Plaintiff and was later supported by a reply memorandum. (Rec. docs. 30, 41, 44). Following a hearing on October 26, 2016, the Court dismissed Plaintiff's federal claims against Haydel and Neal with prejudice as having been insufficiently pled and dismissed Plaintiff's state-law claim against Haydel without prejudice pending proceedings under the LMMA. (Rec. doc. 45). The case was stayed and administratively closed for that purpose. (*Id.*).

---

[3/] Although Plaintiff's amended complaint makes a single reference to his original complaint (rec. doc. 29 at p. 1), because the amended pleading does not specifically adopt or incorporate by reference his initial pleading, the amended complaint supersedes the earlier pleading and renders the latter of no legal effect. *Eason v. Holt*, 73 F.3d 600, 603 (5th Cir. 1996); *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994).

On April 9, 2018, Plaintiff filed an *ex parte* motion to dismiss his remaining state-law claim against Haydel with prejudice and to lift the stay in this matter and return it to the Court's active docket. (Rec. doc. 46). That motion was granted on April 12, 2018 and the case as to the four remaining Defendants was reopened. (Rec. doc. 47). In due course, TPCG and Neal filed the present motion, which was later joined in by the other two Defendants, Larpenter and Triche. (Rec. docs. 61, 65). The motion was ultimately scheduled for hearing on June 5, 2019 at 11:00 a.m. and was taken under advisement after Plaintiff was granted an extension of time within which to file an opposition memorandum, which has since been responded to by Defendants, as well as a witness and exhibit list which he had earlier neglected to file. (Rec. docs. 66, 77, 82, 85, 86).

Defendants now move for summary judgment as to all of Plaintiff's claims under Rule 56, asserting various grounds in support. Before turning to those grounds, the Court will recall the legal standards governing summary judgment followed by a discussion of the evidence established by Defendants' motion.

Summary judgment is appropriate under Rule 56(c) when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548 (1986). Although all inferences drawn from the evidence are to be resolved in the non-movant's favor, he may not rest on the mere allegations or denials in his pleadings. *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). Rather, once a properly supported motion for summary judgment is made, the burden shifts to the non-movant, who bears the burden of proof at trial to show with "'significant probative' evidence" that there exists a triable factual issue. *Kansa Reinsurance v. Cong. Mortgage Corp. of Texas*, 20 F.3d 1362, 1371 (5th Cir. 1994)(quoting *In re: Municipal Bond*

*Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982)). That burden is not satisfied by "... 'some metaphysical doubt as to the material facts,' ... by 'conclusory allegations,' ... by 'unsubstantiated assertions,' ... or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(en banc)(citations omitted). Rather, the nonmovant "... must adduce admissible evidence which creates a fact issue concerning the existence of every essential component of that party's case; naked assertions of an actual dispute will not suffice." *Matter of Lewisville Properties, Inc.*, 849 F.2d 946, 950 (5th Cir. 1998). The insufficiency of the proof must be such that it would prevent a rational finder of fact from finding for the non-moving party. *Phillips Oil Co v. OKC Corp.*, 812 F.2d 265, 272-73 (5th Cir.), *cert. denied*, 484 U.S. 851, 108 S.Ct. 152 (1987).

The competent summary judgment evidence before the Court indicates that Dr. Haydel was appointed by TPCG to be its Medical Director at TPCJC in connection with a "Contract for Professional Services" that was entered into between it and the doctor to satisfy the former's statutory duty under LSA-R.S. 15:703 to "... attend the prisoners who are confined in parish jails whenever they are sick."[4/] (Rec. doc. 61-3). Dr. Haydel discharged

---

[4/] That statute provides in full as follows:

A. The governing authority of each parish shall appoint annually a physician who shall attend the prisoners who are confined in parish jails whenever they are sick. His salary shall be fixed by the governing authority. Any physician so appointed shall be licensed as provided in R.S. 37:1271 and shall be a qualified health care provider in accordance with R.S. 40:1231.2.

B. In lieu of appointing a physician, the governing authority of any parish may enter into a contract with a health care provider, licensed or regulated by the laws of this state, to provide requisite health care services, as required in this Section. The term "health care provider" as used in this Subsection means a person, partnership, limited liability partnership, limited liability company, corporation, facility, or institution licensed or regulated by the laws of this state to provide health care services or professional services as a physician and qualified as such in accordance with R.S. 40:1231.2.

C. When a physician has been appointed or a contract for health care services for prisoners has been entered into in accordance with this Section, any action by a prisoner or his representative to recover damages or any other losses, including those for the death of the prisoner, as a result of the actions or inactions of the physician or health care provider in the performance or nonperformance of health care services shall be governed by the provisions of R.S. 40:1231.1 et seq. The term "health care provider" as used in this Subsection shall be as defined in R.S. 40:1231.1.

his contractual duties to TPCG by conducting "sick call" evaluations of inmates twice weekly and by being available to the medical staff 24 hours per day for consultation and referrals. (*Id.*).  In addition to its contractual relationship with Dr. Haydel, at all pertinent times TPCG also employed Neal, a licensed EMT, to serve as the Medical Administrator of the Medical Department at TPCJC, including the scheduling and management of the medical staff.  (*Id.*).  According to Neal's declaration, which was made under penalty of perjury pursuant to 28 U.S.C. §1746, in order to access medical care at TPCJC, an inmate is required to submit a sick-call request to the medical staff, which is either handled by an EMT or one of the members of the nursing staff.  The inmate may also be scheduled to see Dr. Haydel or another physician when on their appointed "sick call" rounds.  (*Id.*).  In addition to the foregoing sick-call request procedure, inmates also have direct physical contact with members of the medical staff twice daily during the dispensing of medication.  (*Id.*).  The medical staff at TPCJC consists of an unidentified number of nurses and EMTs, Dr. Haydel and another physician, all of whom function pursuant to certain standing orders and Basic Jail Guidelines issued by the doctors.  (*Id.*).

The summary judgment evidence further indicates that Plaintiff was arrested and processed into TPCJC on December 16, 2014 on charges of aggravated kidnapping and aggravated assault with a firearm.  (Rec. doc. 61-8, pp. 29-47).  Upon being medically

---

D.  The sole responsibility of the governing authority of each parish which is mandated by the provisions of this Section with respect to providing health care services for prisoners shall be the appointment of a physician and the payment of the salary of that physician or its contractual obligations with a health care provider selected in accordance with this Section.  The parish and its governing authority shall not be liable for any action arising as a result of the actions or inactions of the physician or health care provider, whether ex delicto or ex quasi delicto or ex contractu, by a prisoner or his representative to recover damages or any other losses, including those for the death of the prisoner, unless the governing authority exercises gross negligence or willful misconduct in the performance of its duties and obligations imposed by this Section, and such gross negligence or willful misconduct was a substantial factor in causing the injury.

screened at TPCJC, Plaintiff was noted to have an elevated blood sugar level and was thus transported to the L.J. Chabert Hospital where he was given a dosage of insulin. (*Id.*). The TPCJC's "Medical History and Physical Examination Record" that was generated in connection with his processing was positive for diabetes and hypertension and past surgeries involving the lower back, left foot, and right leg. (*Id.*). Plaintiff was on Lantus and Lasix at the time and the screening documents indicate that members of the TPCJC Medical Department made a series of phone calls to local pharmacies to confirm the medications that Plaintiff was then taking. (*Id.*). As part of the medical screening process, Plaintiff was administered a TB test, was prescribed a 2000-calorie diabetic diet that included reduced salt intake, fresh fruit, and an evening snack, and modifications were made to his footwear to accommodate a partial left foot amputation he had undergone previously. (*Id.*). Notably, the TPCJC medical screening documents were negative for any boils, rash, discharge, or open wounds. (*Id.* at p. 36).

Notes from the TPCJC Medical Department reflect that on December 18, 2014, a staff member called Dr. Haydel for consultation on how best to deal with Plaintiff's elevated blood sugar levels. (*Id.* at p. 28). As a result of that consultation, the dosage of Plaintiff's Metformin was increased and Amaryl was added along with a sliding-scale dosage of Humalog. (*Id.*). In a subsequent note dated December 25, 2015, a member of the Medical Department documented that Plaintiff was very aggravated during the morning medication pass that day, requesting that he be taken to the hospital for treatment of constipation from which he alleged to have been suffering for 10 days. (*Id.* at p. 27). The reporting official noted that Plaintiff had only brought this complaint to the attention of the Medical Department the previous day and he was advised to use over-the-counter laxatives that were available to

inmates for purchase from the jail commissary. (*Id.*). When asked to take the medication that was being dispensed to him, Plaintiff became "very aggressive," cursing out the attending health care provider and requesting again to be taken to the hospital. (*Id.*). Plaintiff was informed that inmates are simply not sent to the hospital for treatment of constipation. (*Id.*).

The following day, Plaintiff again complained to a member of the Medical Department that he had not had a bowel movement in 14 days. (*Id.* at p. 26). Plaintiff was given a dosage of magnesium citrate, was instructed to increase his water intake, and was advised to contact the Medical Department if his problem persisted. (*Id.*). On December 28, 2014, a member of the Medical Department updated Plaintiff's file by documenting that he was to be seen by a physician to address his elevated blood pressure readings. (*Id.* at p. 25). Plaintiff was duly seen by Dr. Haydel three days later who ordered that he be restarted on Lantus. (*Id.* at p. 24).

On January 25, 2015 at 10:00 a.m. Plaintiff completed his first "Request for Medical Attention Form" ("sick call form") in which he expressed a need for reading glasses as well as the addition of liver to his diet twice per day due to a blood condition. (*Id.* at p. 20). Plaintiff was seen by a member of the medical staff six hours later who advised him to have a family member bring him reading glasses or to purchase them through the TPCJC commissary. (*Id.*). He was also referred to the kitchen staff about the reported need for liver twice per week. (*Id.*). Plaintiff completed his second sick-call request form two days later in which he renewed his need for reading glasses. (*Id.* at p. 19). He was seen by a member of the medical staff on January 9, 2015 who investigated the matter and determined that although Plaintiff was in possession of eyeglasses upon his admission to TPCJC, there was no

documentation regarding the location or disposition of the spectacles. (*Id.*). Plaintiff was again instructed to obtain reading glasses through the prison commissary. (*Id.*).

The next notation to Plaintiff's TPCJC medical file was not made until February 10, 2015 when Plaintiff completed his third sick-call request form reporting a bad cold and a need for medication to control his cough. (*Id.* at p. 16). Plaintiff was evaluated by a member of the Medical Department later that same day who observed no signs of nasal congestion at the time and thus instructed Plaintiff to purchase over-the-counter medications from the commissary for relief. (*Id.*). Plaintiff was seen again by Dr. Haydel on March 24, 2015 for monitoring of his blood sugar levels which were elevated in the afternoon but lower in the morning. (*Id.*). The assessment was diabetes mellitus and hypertension; Plaintiff's medications were adjusted. (*Id.*). He completed another sick-call request form on March 29, 2015, this time complaining of a runny nose and a bad cough. (*Id.* at p. 10). Plaintiff was seen by an EMT later that day who advised him to purchase over-the-counter medications for his complaints after noting no symptoms of nasal congestion or cough at that time. (*Id.*).

Plaintiff completed his fifth and final sick-call request form on March 30, 2015, citing a bad cough and a runny nose as well as "… a staff (sic) on my leg by my butt …" that made it difficult to sit or walk. (*Id.* at p. 9). He was seen by an EMT later that same day who diagnosed Plaintiff with a boil to the buttocks and placed him on a 10-day course of Bactrim. (*Id.*). With the exception of medication flow sheets which reflect the dispensing of various medications, including Bactrim, to Plaintiff over the course of the next two days (*id.* at pp. 4-6), the TPCJC records provided to the Court contain no further documentation respecting the provision of medical care to Plaintiff. He was released from TPCJC on April 1, 2015. (Rec. doc. 61-2, p. 3).

Eight days after his release Plaintiff presented to the Terrebonne General Medical Center ("TGMC") Emergency Department ("ED") complaining of a boil on his left leg. Although a "Sign-In Form" included in the mass of TGMC records that have been provided to the Court contains a notation that the problem had started two weeks earlier (Ex. C, p. 251), the attending physician's two-page note indicates that the abscess to Plaintiff's left buttock had manifested itself only five days earlier. (*Id.* at pp. 217-218). The more detailed, six-page "Emergency Department Chart" of that date contains a listing of medical problems from which Plaintiff had suffered in the past including abscesses of the face and chin, an epidermoid cyst, and cellulitis of the foot. (*Id.* at pp. 207-212). Following his evaluation by Dr. Brian Roberts, Plaintiff was diagnosed with an abscess and was prescribed a course of Bactrim, the very same medication he had received at TPCJC prior to his release. (*Id.*).

Plaintiff returned to the TGMC ED on May 2, 2015, this time complaining of symptoms of an upper respiratory infection of one to two days' duration. (*Id.* at pp. 250, 215-216, 202-206). A chest x-ray was taken, which produced normal results. (*Id.* at p. 244). Plaintiff was administered an injection of Decadron and a dosage of Tylenol while at the ED and was prescribed Zithromax and cough medicine at the time of discharge. (*Id.*). Plaintiff was seen again at the ED the very next day, this time for an abscess to the right buttock for the previous three days which was reported to be draining pus. (*Id.* at pp. 249, 213-214, 243, 197-201). A testicular ultrasound was performed and was largely unremarkable, except for findings possibly suggestive of mild epididymitis. (*Id.*). Following the administration of Lidocaine to the affected areas, incisions and drainage of the abscesses was performed and Plaintiff was discharged with prescriptions for Bactrim DS and Lortab. (*Id.*). The diagnosis at the time of discharge was a three-centimeter abscess to the right medial buttock and epididymitis. (*Id.*).

On May 5, 2015, Plaintiff again presented to the TGMC ED with complaints of swelling to the testicles and penis. (*Id.* at pp. 2513, 2017-2072, 2073-2074, 2065-2070, 2059-2064, 2054-2058). During the course of triage, Plaintiff recalled having been told at the ED that his previously-diagnosed abscess was "an infection from a hair." (*Id.*). The clinical impression was cellulitis and uncontrolled diabetes and the decision was made to admit Plaintiff to the hospital for administration of IV antibiotics. (*Id.*). Following consultations with additional physicians over the next two days, Plaintiff was diagnosed with a perineal abscess, scrotal swelling, Fournier's gangrene, hypertension, and diabetes. (*Id.* at pp. 2189-2190, 2191-2192). On May 7, 2015, Plaintiff underwent extensive debridement of the scrotum and right buttocks; the post-operative diagnosis was severe necrotizing fasciitis of the perineum, scrotum, and right buttocks typical of Fournier's gangrene. (*Id.* at pp. 2286-2287). A wound dressing change and further debridement were done on May 9, 2015 and a diverting colostomy and extensive debridement of the perineal wound were performed two days later. (*Id.* at pp. 2292, 2288). Additional wound dressing changes and debridements were performed over the succeeding days and a partial closure of the wound site was done on May 20, 2015. (*Id.* at pp. 2293, 2297, 2174, 2289, 2187, 2294). On May 22, 2015, the wound dressing change was performed without the necessity of general anesthesia. (*Id.* at p. 2295). Plaintiff's condition continued to improve and a secondary closure was successfully performed on May 29, 2015. (*Id.* at pp. 2049-2053, 2361). Plaintiff was discharged from TGMC on June 1, 2015. (*Id.* at pp. 2049-2053, 2361).

Plaintiff subsequently received post-operative care at TGMC throughout the month of June, including the removal of sutures on June 18, 2015. (*Id.* at pp. 104-106, 143, 118, 140-142, 122). Following a wound evaluation on September 1, 2015, Plaintiff underwent a

successful inpatient colonoscopy reversal on September 14, 2015, ultimately being released from the hospital on September 21, 2015. (*Id.* at pp. 547-549, 598-601, 602, 573-575, 557-558, 554-555, 546).

Having summarized the medical evidence pertaining to Plaintiff's skin condition, the Court now turns to the grounds for dismissal raised by Defendants' motion and the arguments offered by Plaintiff in opposition. Defendants first argue that Plaintiff has not provided an adequate basis for holding TPCG liable under §1983 because he has failed to identify a policy or procedure that was the moving force for the violation of a constitutional right. (Rec. doc. 61-1, pp. 8-11). TPCG also argues that it is immune from any state-law claims asserted by Plaintiff under two state statutes, LSA-R.S. 15:703 and 9:2798.1.

TPCG, as a local governing entity, is considered to be a "person" within the meaning of §1983 and is therefore subject to suit under that civil rights statute. *Monell*, 436 U.S. at 692, 98 S.Ct. at 2036. However, a governmental body like TPCG may not be held liable for the actions of its employees under a theory of *respondeat superior* or vicarious liability. *Id.* at 691-94, 98 S.Ct. at 2036-38. Rather, such a governmental body may be held liable under §1983 only "… when execution of a government's policy or custom … inflicts the injury that the government as an entity is responsible [for] under §1983." *Id.*[5/] Thus, to establish municipal liability under §1983, a plaintiff must prove three elements: 1) an official policy or custom, of which 2) a policymaker can be charged with actual or constructive knowledge, and 3) a constitutional violation whose moving force is that policy or custom. *Valle v. City of Houston*, 613 F.3d 536, 541 (5th Cir. 2010)(citing *Pineda v. City of Houston*, 291 F.3d 325, 328

---

[5/] The same is true for supervisory officials. *Conner v. Travis County*, 209 F.3d 794, 796 (5th Cir. 2000)(citing *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 1203 (1989) and *Breaux v. City of Garland*, 205 F.3d 150, 161 (5th Cir. 2000)).

(5th Cir. 2002)).  The first element of the three-part municipal liability test may come in the form of:

1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officer or by an official to whom the lawmakers have delegated policymaking authority; or,

2. A persistent, widespread practice of city officials or employees which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy.  Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policymaking authority.

*Johnson v. Moore*,
958 F.2d 92, 94
(5th Cir. 1992).

With respect to the second element, a plaintiff must establish that the identified policy came from a policymaker of the municipality.  *Malone v. City of Fort Worth, Texas*, 297 F.Supp.3d 645, 653 (N.D. Tex. 2018).  A policy or custom can said to be "official" for purposes of §1983 when it results from the decision or acquiescence of the municipal official or body with "final policymaking authority" of the offending policy.  *Id.* (quoting *Gros v. City of Grand Prairie*, 181 F.3d 613, 615 (5th Cir. 1999)).  In situations where the policy results from a persistent, widespread practice or custom that is so common as to be said to represent municipal policy, actual or constructive knowledge of such practice or custom must be shown.  *Hicks-Fields v. Harris County*, 860 F.3d 803, 808 (5th Cir. 2017).  "Actual knowledge may be shown by such means as discussion at council meetings or receipt of written information."  *Id.*  Constructive knowledge, on the other hand, may be attributable to the governing body on the theory that it would have known of the violation had it properly exercised its responsibilities where, for example, the violations were so persistent and

widespread that they were the subject of prolonged public discussion or a high degree of publicity. *Id.*

Finally, to establish municipal liability, a plaintiff must demonstrate that the governing entity, through its deliberate conduct, was the "moving force" behind the injury alleged; plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal policy and the deprivation of federal rights. *Malone*, 297 F.Supp.3d at 655 (quoting *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382, 1388 (1997)). "For a municipality to be liable on account of its policy or custom, the plaintiff must show that (1) the policy *itself* violated federal law or authorized or directed the deprivation of federal rights, or (2) the policy was adopted or maintained with deliberate indifference as to the known or obvious consequence that it would result in the violation of someone's federal rights." *Id.* In the latter situation, a demonstration of at least a pattern of similar violations of federal rights is generally required as a single, or even handful of violations, will not be enough for a court to conclude that the municipality maintained a policy with deliberate indifference to the rights of persons within its jurisdiction. *Id.*

Pertinent to the matter at hand are two theories under which the existence of an official policy might possibly be established. "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of §1983." *Connick v. Thompson*, 563 U.S. 51, 61, 131 S.Ct. 1350, 1359 (2011). Nevertheless, the Supreme Court has emphasized that municipality liability based on a failure-to-train theory is at its most tenuous. *Id.* An inadequate training program or a failure to train, if shown to be an official

policy or custom of which a municipality has knowledge, may serve as the basis for §1983 liability only where inadequate training amounts to deliberate indifference to the rights of the persons with whom authorities come into contact. *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 1204 (1989). Thus, to hold a municipality liable under §1983 based on a policy of inadequate training, a plaintiff must demonstrate that: 1) the municipality's training policy was inadequate, 2) the municipality was deliberately indifferent in adopting its training policy, and 3) the inadequate training policy directly caused the constitutional violation. *Kitchen v. Dallas County*, 759 F.3d 468, 484 (5th Cir. 2014). Deliberate indifference in this context may be shown by demonstrating that a municipality had notice of a pattern of similar violations and that it failed to change its training methods in the face of such incidents. *Malone*, 297 F.Supp.3d at 655-56. Alternatively, a plaintiff may establish indifference based upon a single incident in the narrow range of circumstances where a constitutional violation is likely to result as the highly predictable consequence of a particular failure to train. *Kitchen*, 759 F.3d at 484.

The second theory potentially implicated in the instant matter is that of establishing a policy or custom of a failure to supervise or inadequate supervision. *Malone*, 297 F.Supp.3d at 656. To prevail on a failure-to-supervise theory, a plaintiff must show that: 1) the supervision policies of the municipality were inadequate, 2) the municipality was deliberately indifferent in adopting such policies, and 3) the inadequate supervision policies directly caused the plaintiff's injuries. *Id.* "Proof that a single constitutional violation resulted from inadequate supervision is ordinarily insufficient to hold a municipality liable for inadequate supervision." *Id.* (citing *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001)). Typically, the plaintiff must demonstrate a pattern of similar violations to

establish the deliberate indifference required to impose municipal liability for failure to supervise because only when a failure to train or supervise reflects a "deliberate" or "conscious" choice can the governmental entity be liable for such a failure under §1983. *Id.* (citing *City of Canton*, 489 U.S. at 388-89, 109 S.Ct. at 1205). The need for more or different training or supervision must be so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the municipality can reasonably be said to have been deliberately indifferent to the need, and the failure to provide proper training or supervision may fairly be said to represent a policy for which the municipality is responsible. *Id.* (quotations and citations omitted).

With the foregoing standards in mind, the Court must now determine whether the competent summary judgment establishes municipal liability on the part of TPCG. In his supplemental and amended complaint, Plaintiff alleged, in a wholly conclusory fashion, that "[p]olicymaking Defendants Larpenter, Triche, [and] Neal ... knew that the policies, practices, and procedures with respect to medical care at the Terrebonne Parish Criminal Justice Complex were inadequate and posed a danger of serious bodily injury to detainees there" and "... took no action to correct these policies, practices, and procedures." (Rec. doc. 29, p. 6). Plaintiff does not identify precisely what the objectionable policies, practices, or procedures were or how or when they came into existence, nor does he suggest what action could have been taken to remedy their supposed infirmity. Unfortunately for Plaintiff, simply alleging that a policy exists is insufficient to carry the day: "[e]ach and any policy which allegedly caused constitutional violations must be specifically identified by a plaintiff." *Piotrowski v. City of Houston*, 237 F.3d 567, 579-80 (5th Cir. 2001). Morever, "[t]he description of a policy or custom and its relationship to the underlying constitutional

16

violation … cannot be conclusory; it must contain specific facts." *Spiller v. City of Texas City*, 130 F.3d 162, 167 (5th Cir. 1997); *Meyer v. Coffey*, 231 F.Supp.3d 137, 148-49 (N.D. Tex. 2017). The allegations presented in Plaintiff's amended complaint fall woefully short of that standard and his memorandum in opposition to Defendants' motion does not remedy that shortcoming.

With respect to the second element of municipal liability, the burden remains on Plaintiff to identify the positive law or evidence of custom demonstrating that Larpenter, Triche, and Neal were indeed the final policymakers responsible for the action or inaction alleged. *Meyer*, 231 F.Supp.3d at 147-48. That showing is not apparent from a review of Plaintiff's operative pleading. Although Plaintiff generally alleged, earlier on in his amended complaint, that Larpenter, Triche, and Neal were responsible for properly hiring, training, and supervising employees of TPCJC (rec. doc. 29, p. 5),[6/] he failed to identify precisely what those hiring, training, and supervisory practices were and to explain how they were inadequate. Nor does Plaintiff identify any prior incidents of a similar nature that were known by the Defendants and were allowed to go uncorrected such that their failure to do so could be equated with deliberate indifference. Inasmuch as the summary judgment evidence establishes that Plaintiff did, in fact, receive medical care throughout the duration of his stay at TPCJC, certainly no arguable claim premised upon a custom of denying medical care to inmates would lie here. *Cardenas v. Lee County, Texas*, 569 Fed.Appx. 252, 255-56 (5th Cir. 2014). More fundamentally, without expert medical testimony to opine on the existence and cause of any medical condition from which Plaintiff allegedly suffered at TPCJC, no

---

[6/] As for Sheriff Larpenter, Plaintiff's factually unsupported allegations went even further: not only was he charged with being ultimately responsible for the hiring, training, supervising, etc. of all employees of TPCJC, he was also alleged to be "… responsible for each and every other Defendant named." (Rec. doc. 29, p. 5, ¶ 19).

rational juror could find that he had a serious medical need while he was housed there, much less that the Defendants were deliberately indifferent to any such need. *Rutledge v. Jackson*, No. 06-CV-0064, 2009 WL 311149 at *3-4 (S.D. Miss. Feb. 6, 2009). Even if he had, an expert's opinion, standing alone, is generally insufficient to establish deliberate indifference based upon a lack of training or supervision. *Thompson v. Upshur County, TX*, 245 F.3d 447, 459 (5th Cir. 2001); *Conner v. Travis County*, 209 F.3d 794, 797-98 (5th Cir. 2000).

In his belated opposition to Defendants' motion, Plaintiff concedes that TPCG is not vicariously liable for the actions of the medical care providers at TPCJC. (Rec. doc. 82, p. 3). Thereafter, he advances for the first time a theory of liability that is found nowhere in his original or amended complaints: "... that Terrebonne Parish is directly liable under §1983 for hiring CorrectHealth because the parish allegedly knew the company would provide 'grossly negligent and unconstitutionally infirm' medical care to inmates at TPCJC." (*Id.*).[7] Just like Plaintiff's allegations regarding the existence of a policy or custom, his equivocal hiring-related allegations are wholly conclusory and lacking in supporting facts. He provides the Court with no evidence of prior incidents of a similar nature of which TPCG had knowledge and ignored so as to amount to deliberate indifference. Plaintiff also fails to explain how TPCG's hiring policies were insufficient and he points to no opinions from an expert in the field of hiring practices setting forth how alternative procedures would have resulted in a different outcome. Without such expert testimony, Plaintiff is unable to carry his burden of proving the standard of care to which he has entitled, breach of that standard of care, and causation. *Fulmer v. United States*, No. 17-CV-15943, 2019 WL 1989233 at 5-8

---

[7] In addition to the novelty of this theory, this is the first mention of an entity called CorrectHealth in this case. The operative "Contract for Medical Services" that has been provided to the Court is between TPCG and Haydel Family Practice – Professional Medical Corporation. (Rec. doc. 61-3, pp. 3-10).

(E.D. La. May 6, 2019); *Rutledge*, 2009 WL 31149 at *4. The two fundamental requirements for holding a municipality liable for inadequate hiring – culpability and causation – are wholly absent here. *Snyder v. Trepagnier*, 142 F.3d 791, 795 (5th Cir. 1998).

The second basis for Plaintiff's opposition to Defendants' motion is as novel as his first in terms of its audition in a memorandum rather than in pleadings previously filed in this case. Plaintiff acknowledges that an entity like TPCG may contract away the responsibility for providing medical care to inmates under R.S. 15:703(B). (*See* note 4, *supra*). Plaintiff focuses in on the following two provisions of the contract between TPCG and Dr. Haydel which provide that:

9. Inmate health complaints will be collected daily and evaluated the same day by a nurse under the supervision of the Jail Physician.

10. The doctor will conduct sick call in the jail whenever necessary at the request of the medical assistant (nurse).

(Rec. doc. 61-3, p. 8).

Plaintiff maintains that the foregoing two contractual provisions are at odds with the following two sections of the Louisiana Administrative Code:

D. Treatment given by other than a licensed physician shall be made by trained personnel according to written, standing or direct orders of the physician in charge.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

F. Inmates shall have access to routine health care by a physician within 48 hours after making such request.

(Rec. doc. 82-3, p. 1)(citing
Louisiana Administrative Code
Title 22, Part III, §2909(D) and (F)).

Plaintiff argues that an inconsistency exists between the above-cited contractual and code provisions, which he says constitutes a delegation of medical-care responsibility that

was inconsistent with state law and thus demonstrates that TPCG was "grossly negligent in contracting for substandard medical care for inmates at the TPCJC." (Rec. doc. 82, p. 5).

As noted above, without the opinion from an expert in the field, Plaintiff is unable to establish that the care that *he* received at TPCJC was substandard in any respect or even that any medical need that he had while he was housed there was "serious" in a constitutional sense. What is clear is that the failure of governmental officials to fulfill their duties under state law or contract does not give rise to a federal constitutional claim under §1983. *Ponce v. Louisiana Dept. of Corrections*, No. 10-CV-1478, 2013 WL 3227020 at *2 (W.D. La. Jul. 1, 2013), *vacated and remanded in part on other grounds*, 590 Fed.Appx. 444 (5th Cir. 2015)(citing *Meyers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir. 1996)); *Reyes v. Hale County Jail*, No. 03-CV-0180, 2003 WL 22670929 at *2 (N.D. Tex. Sept. 16, 2003). A violation of the Louisiana Administrative Code is simply not of constitutional magnitude so as to be actionable under §1983. *Allen v. St. Tammany Parish*, No. 17-CV-4091, 2018 WL 558503 at *3 (E.D. La. Jan. 2, 2018), *adopted*, 2018 WL 537495 (E.D. La. Jan. 24, 2018).

It is also clear that a claim of negligence or even gross negligence does not implicate the Constitution and does not provide a basis for a §1983 claim. *Delgado v. United States Marshal*, No. 12-CV-0347, 2014 WL 4387344 at *7 (W.D. La. Sept. 3, 2014), *appeal dis'd*, 618 Fed.Appx. 236 (5th Cir. 2015). The express wording of R.S. 15:703(D) also renders TPCG immune from state tort claims as a result of the action or inaction of the contracting health care provider absent a showing of gross negligence or willful misconduct and proof that "… such gross negligence or willful misconduct was a substantial factor in causing the injury." *Belcher v. Lopinto*, No. 18-CV-7368, 2018 WL 5847822 at *3 (E.D. La. Nov. 8, 2018); *Bush v. LaFourche Parish Council*, No. 09-CV-3436, 2012 WL 258591 at *2-3 (E.D. La. Jan. 26, 2012).

Without the opinion of an expert, Plaintiff is unable to make that showing. Furthermore, as Plaintiff advances no challenge to Dr. Haydel's licensure, or that of any of the other health care providers at TPCJC, upon contracting with the doctor TPCG fulfilled its statutory obligation under R.S. 15:703 and is thus immune from state tort liability. *Serigny v. Lafourche Parish Gov't ex rel. Randolph*, 547 Fed.Appx. 582, 583-85 (5th Cir. 2013).

Plaintiff did not allege in his amended complaint that Neal, Larpenter, and/or Triche were in any way personally involved in the acts or omissions giving rise to his claims. That being the case, Plaintiff had no viable §1983 claims against those Defendants in their individual capacity. *Serigny v. LaFourche Parish Gov't ex rel. Randolph*, No. 10-CV-3205, 2014 WL 2215744 at *5 (E.D. La. May 28, 2014). Such supervisory officials, as well as TPCG, cannot be held liable for constitutional violations committed by parish authorities unless those violations result directly from a municipal custom or policy. *Conner*, 209 F.3d at 796. Plaintiff, however, has identified no parish policy, practice, or custom that caused the damages he claims in the manner contemplated by *Monell*. *Authement v. Parish of Terrebonne*, No. 09-CV-4618, 2010 WL 1930943 at *6 (E.D. La. Mar. 19, 2010), *adopted*, 2010 WL 1930938 (E.D. La. May 10, 2010). Otherwise, to establish municipality or supervisory liability in a single-episode case like this one, Plaintiff must demonstrate deliberate indifference by showing that an official was aware of facts from which an inference of substantial risk of harm could be drawn, that the official drew that inference, and that the official subjectively intended that harm occur. *Thompson*, 245 F.3d at 458-59; *Cardenas*, 569 Fed.Appx. at 255. That weighty showing has not been made here. TPCG is also entitled to immunity from Plaintiff's state law claims under R.S. 15:703. And without an expert to support his claims and to rebut the opinions of Defendants' expert, Plaintiff is unable to

establish the standards of care to which he was entitled, a breach of those standards, and causation so as to prevail on any federal or state law claims. *Fulmer*, 2019 WL 1989233 at *7-8; *Rutledge*, 2009 WL 311149 at *3-4. The expectedly self-serving nature of the allegations present in the declarations provided by Plaintiff do not alter the Court's conclusions as the allegations are lacking in corroborating facts and do not speak to the existence *vel non* of an unconstitutional policy, practice, or custom. For all these reasons, it is ordered that Defendants' motion is granted and that Plaintiff's suit is dismissed. Judgment will be entered accordingly.

New Orleans, Louisiana, this ___13th___ day of _____July_____, 2019.

_____
MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE